UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| STONEWARE, INC., | ) | |
| | ) | |
| Plaintiff, Counterclaim-Defendant, | ) | |
| | ) | |
| vs. | ) | 1:07-cv-1188-SEB-TAB |
| | ) | |
| TECSERV, INC., | ) | |
| | ) | |
| Defendant, Counterclaim-Plaintiff. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Plaintiff/Counterclaim-Defendant's Motion for

Summary Judgment [Docket No. 53], filed on April 21, 2009, pursuant to Federal Rule of

Civil Procedure 56 and Local Rule 56.1.  Plaintiff/Counterclaim-Defendant Stoneware,

Inc. ("Stoneware") seeks a declaratory judgment that Defendant/Counterclaim-Plaintiff

TecServ, Inc. ("TecServ") is neither the owner of, nor has the right to acquire, an

ownership interest in Stoneware, and also seeks to recover monies from TecServ on

allegedly unpaid invoices for licenses of computer software.  TecServ asserts various

affirmative defenses as well as a number of counterclaims, including breach of contract,

breach of covenant of good faith and fair dealing, conversion, and unjust enrichment.

For the reasons detailed below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u>

Stoneware's Motion for Summary Judgment.[1]

## **Factual Background**

Stoneware is an Indiana corporation whose business is creating Internet-based software that enables its customers to build "web networks."[2]  Affidavit of Rick German ("German Aff.") ¶ 4.  Stoneware's products supply various market niches, including the educational, manufacturing, medical, legal, and financial sectors.  Id. ¶ 5.  TecServ is a distributor of computer software and related services.  Its principal place of business is located in Salt Lake City, Utah.

Pursuant to the Software Distribution Agreement ("Distribution Agreement") executed between the parties on April 20, 2005, TecServ acted as the "exclusive worldwide distributor" of Stoneware's products from April 2005 through May 2007. During that time, TecServ operated under the name "Stoneware Partners"[3] and helped to increase Stoneware's revenue in large part through new branding and marketing strategies as well as the creation of an extensive customer list.  According to TecServ, six sales and technical professionals ("the Key Professionals") whom it had hired in 2006 were integral

---

[1] In its responsive briefing, TecServ waived or abandoned a number of the counts asserted in its counterclaim.  Accordingly, we GRANT Stoneware's Motion for Summary Judgment as to Counts IV, VI, and VIII in TecServ's counterclaim.

[2] Stoneware's suite of products enables its clients to provide their employers and customers with one secure point of access to access all of the client's web applications, online services, servers, documents, content, and portals.

[3] For consistency purposes, Defendant is referenced as TecServ throughout this opinion.

to the success of growing Stoneware's business.

**Breach of the Distribution Agreement and Unpaid Invoices**

In early 2007, TecServ allegedly breached the Distribution Agreement by failing either to meet its sales quotas or in lieu of meeting those sales goals by failing to make minimum guaranteed payments to Stoneware.  Consequently, on May 22, 2007, Stoneware's President and CEO, Rick German, notified TecServ in writing that TecServ was in breach of the Distribution Agreement, which would be terminated unless the required payments were made in full by June 21, 2007.  Despite the alleged breach, TecServ continued to place orders on credit with Stoneware for software and related services throughout the spring and summer of 2007.  Stoneware filled those purchase orders, furnished the requested software to TecServ, and provided invoices for payment on 30-day credit terms, with past due balances accruing a ten percent finance charge. TecServ admits that it never made payments on any of the disputed invoices at issue in this litigation and does not contest that the balance of the unpaid invoices total approximately $150,000, as Stoneware contends.[4]

Nevertheless, TecServ maintains that it is entitled to an offset from the amount it owes because Stoneware owes it $163,181.20 for services it provided to Stoneware,

---

[4] On September 21, 2007, Mr. Hall sent an email to Mr. German in which he stated, "I want to visit with you on what TecServ still ows [sic] you; I think it's $150,000."  Docket No. 53-7.

3

including a reimbursement of expenses TecServ allegedly incurred in connection with providing training and education as well as payment for completed sales for which it allegedly never received credit. Specifically, TecServ alleges it is owed the following amounts: (1) $9,167.96 based on Stoneware's accounting documents; (2) $2,920.74 for travel expenses incurred in connection with providing training and education for Stoneware's software; (3) $6,880.00 for a July 2007 software sale; and (4) $43.262.50 for the July and August 2007 sales of products and services to ThinkTank,[5] a reseller of Stoneware software hired by TecServ; and (5) $100,950.00 for an August 2007 sale of Stoneware software to Indianapolis Public Schools.

The Distribution Agreement provides that TecServ was entitled to sixty percent of Stoneware software sales. Although, as discussed above, on May 22, 2007, Stoneware notified TecServ that it was in breach of the Distribution Agreement, TecServ asserts that, following its receipt of this notice, the parties nevertheless continued to allocate TecServ's sales on a 60/40 basis for which sales it is still owed payment by Stoneware.[6]

**Merger and Acquisition Negotiations**

---

[5] It is not clear based on the evidence submitted by TecServ whether this figure is accurate. In its responsive briefing, TecServ alleges that it is owed $54,107.50 for products and services it sold to Think Tank in July and August 2007, which appears to correspond with the submitted invoices. However, Mr. Ellsworth testified by affidavit that the amount owed is actually $43,262.50.

[6] In support of this contention, TecServ cites Invoice Nos. 2738-43 and 2767-68, all issued after May 22, 2007, which show that TecServ was to receive 60% of various sales of Stoneware software it had completed.

Despite TecServ's alleged breach of the Distribution Agreement, throughout the spring and summer of 2007, Stoneware and TecServ engaged in negotiations regarding a possible merger or the acquisition by TecServ of some portion of Stoneware's stock.  In fact, on May 22, 2007, the same day that Mr. German advised TecServ that it was in breach of the Distribution Agreement, he also sent an e-mail entitled "acquisition" to Alan Hall of TecServ, in which he suggested various potential terms for an acquisition by TecServ of a portion of Stoneware's stock in exchange for TecServ employees and TecServ's assistance in raising capital investment for Stoneware.  There is no mention in that email of the alleged breach of the Distribution Agreement.  German Dep. Exh. 6.

On June 21, 2007, TecServ sent Stoneware a non-binding letter of intent ("the Letter of Intent") regarding the proposed acquisition of some, or all, of the capital stock of Stoneware.[7]  The Letter of Intent provides that it "is not intended to create a binding legal agreement or obligation, but to outline [the parties'] intent to proceed in good faith on the general terms stated above. . . . TecServ and Stoneware will both use reasonable best efforts to consummate this transaction by the Closing date."  Letter of Intent ¶ 12.

_____

[7] The Letter of Intent provides in part:

TecServ proposes to acquire from Stoneware shareholders, Stoneware capital stock representing up to 100% of all outstanding Stoneware shares, including 45.7% of the Stoneware capital stock currently owned by Rick German ("Acquisition").  Alternatively, TecServ is prepared to effect the same transaction as a merger between Stoneware and TecServ ("Merger") if it is determined that such a structure is deemed advantageous (for tax planning or other reasons).

Id. at 1.

5

The Letter of Intent also provides that Stoneware is prevented from hiring any of TecServ's employees during the period of ninety (90) days following the execution of the agreement. Id. ¶ 6(v). Consistent with the Letter of Intent, the parties continued to engage in merger/acquisition negotiations during the summer of 2007, but as of August 16, 2007, had reached no formal, binding agreement.

**The Alleged Oral Contract**

On August 16, 2007, Mr. German traveled to Salt Lake City, Utah, to meet with TecServ CEO, Jim Ellsworth, "in hopes of conducting negotiations toward a possible transaction as contemplated by the parties' letter of intent." Pl.'s Interrog. Resp. No. 4. According to Stoneware, the negotiations were unsuccessful and Mr. German terminated the discussions before any agreement between the parties was reached. TecServ, however, maintains that a verbal agreement was reached on August 16, 2007, the terms of which were as follows: TecServ would release five (5) of its Key Professionals from their non-compete agreements so that Stoneware could hire them, in exchange for ten percent of Stoneware's stock.[8] The parties also discussed an opportunity for TecServ to subsequently acquire no more than an additional fifteen percent of Stoneware's stock, for a total of twenty-five percent, based on TecServ's ability to raise investment funds. Deposition of Jim Ellsworth ("Ellsworth Dep.") at 137-38.

_____

[8] According to the parties' negotiations, the value of 10% of Stoneware's stock equated to one million dollars. Ellsworth Dep. at 139.

6

There are no notes or other written recordation memorializing any part of the meeting between Mr. German and Mr. Ellsworth, nor were any other witnesses present for their discussions.  However, following the August 17, 2007 meeting, a number of emails were exchanged between various Stoneware and TecServ employees that TecServ contends address issues similar to those that were allegedly discussed at that meeting. For example, on August 19, 2007, two days after the oral contract was allegedly reached, Mr. Ellsworth sent an email message to Mr. German in which he makes no reference to an August 17, 2007 agreement, but discusses investors' capital and the fact that the two and a half million dollars TecServ spent developing and marketing Stoneware's product equals the value of twenty-five percent of Stoneware's stock (the same percentage that TecServ contends it could have acquired per the alleged oral agreement if it allowed Stoneware to hire the five Key Professionals and provided all of the required investment funds).  Docket No. 53-4.  Mr. Ellsworth testified by affidavit that, in this email, he was thanking Mr. German "for his encouragement that he would take care of TecServ's investors in terms of giving TecServ the opportunity to acquire an additional 15% of Stoneware."  Ellsworth Aff. ¶ 16.  However, the email makes no mention of TecServ releasing five employees in exchange for ten percent of Stoneware stock.  Ellsworth Dep. at 154.

On August 21, 2007, Mr. German sent an email to Mr. Ellsworth informing him that: "To make offer letters I will need salary information for each individual employee. . . . If you could provide that it would be appreciated."  Docket No. 59-9.  Mr. German sent

another email to Mr. Ellsworth on August 22, 2007, entitled "stock," in which he provided Mr. Ellsworth with the names of two of Stoneware's attorneys, Brad Schwer and Neal Roach,[9] and instructed Mr. Ellsworth to "[t]alk to them to see what might work best for both sides."  Docket No. 59-10.  In that email, Mr. German also requested that Mr. Ellsworth provide the attorneys with a sample of the employment agreement/covenant not to compete.  Mr. Ellsworth testified by deposition that, after receiving Mr. German's email, he left a voicemail with Mr. Schwer regarding the stock agreement.  The next day, on August 23, 2007, Mr. Schwer responded by email, "Jim: We're in process of drafting the document and will get it to you asap.  It may be tomorrow morning, however."  Docket No. 59-14.

On that same day, Kim Page from Stoneware sent an email to Mr. German, Mr. Ellsworth, and Dean Wagner of TecServ stating: "There is no agreement in place at this time and no agreement has been made on Stoneware's hire date for these employees. . . . We can't even make an offer to these employee[s] until the letter of intent is canceled. . . . If there is no agreement in place with signatures from all parties and cancellation of the letter of intent before 3pm EST tomorrow, August 24, 2007, we will not be able to put any of these people on our payroll."  Page Dep. Exh. 3.  On August 24, 2007, Ms. Page sent an email to the five employees TecServ alleges who had been identified and were to

---

[9] Mr. Schwer and Mr. Roach are both transactional attorneys.  Mr. Schwer testified by deposition that he focuses on mergers and acquisitions and has experience in drafting stock purchase agreements.  Deposition of Brad Schwer ("Schwer Dep.") at 4-5.

be released from their non-compete agreements in exchange for ten percent of Stoneware stock, explaining that, "it is with our deepest regret that we were unable to work out an agreement with TecServ for the employment of [the five TecServ employees].  We wish you each the best of luck in your future endeavors."  Docket No. 53-5.

In response to this email, on August 25, 2007, Mr. Ellsworth sent an email to Ms. Page and Mr. German stating: "As you can imagine everyone is in shock.  After all the money we have spend and the hard work to build YOUR Company to say we couldn't arrive at an agreement is just not true. . . . We relied on your word that you were moving ahead to complete the transaction. . . . What was it that made you change your mind?  Were the terms of the contract unacceptable?  Was money an issue?  We are still interested in working with you to help you build your company for the benefit of all."  Docket No. 53-5.  Two days later, on August 27, 2007, Mr. Ellsworth sent another email to Mr. Ellsworth and Ms. Page in which he states:

> One of my major concerns are the 5 employees.  I am going to have to release them today because we have no reason to keep them.  They all seem interested in working with you, but I know the proposal letter prohibits you from you [sic] hiring them.  I know you are saying the deal is off, but I would be willing to let you make offers to them as planned and release you from the letter because I think a lot of them and don't want them to get hurt because you called the transaction off.  Give me a call to discuss.

Docket No. 53-6.

**The Termination Agreement**

On that same day, August 27, 2007, the parties executed a Termination Agreement

9

and Release ("the Termination Agreement").  The second paragraph of the Termination

Agreement provides:

> TecServ hereby irrevocably and unconditionally releases and forever
> discharges Stoneware and its directors, shareholders, officers,
> representatives, employees, agents and assigns from any and all claims,
> debts, liabilities, demands, obligations, actions and causes of action
> (collectively, "*Claims*"), relating to the [Letter of Intent] and with respect to
> all periods on or before the Effective Date [August 27, 2007] (whether or
> not such Claims are known or unknown, choate or inchoate).

Termination Agreement ¶ 2.  The Termination Agreement further states that:

> TecServ hereby (a) acknowledges and agrees that this Agreement shall be a
> complete defense to any Claim released under paragraph 2 above; (b)
> agrees not to pursue any Claim released under paragraph 2 above against
> Stoneware or any other persons released under paragraph 2 above; and (c)
> consents to the entry of a temporary or permanent injunction to prevent or
> end the assertion of any such Claim.

Id. ¶ 3.

The Termination Agreement also addresses Stoneware's right to hire TecServ

employees, providing that: "Notwithstanding anything to the contrary in this Agreement

or otherwise, TecServ acknowledges and agrees that Stoneware may, in its sole

discretion, hire persons employed by TecServ (the '*Employees*')."  Id. ¶ 4(a).  Although

TecServ's employees were bound by non-compete agreements (the "Restrictive

Agreements") at the time the Termination Agreement was executed, the Termination

Agreement specifically releases those employees from their obligations under the

covenants not to compete.  See id. ¶ 4(c) ("TecServ hereby waives any and all compliance

with, or performance under, the Restrictive Agreements by the Employees, releases each

10

of the Employees in full from any and all liability or obligation thereunder and agrees that all of the Restrictive Agreements are hereby terminated in all respects.").

The Termination Agreement contains no provision addressing or otherwise modifying the terms of the open invoices at issue in this litigation.  There is also no mention of the oral contract between the parties allegedly reached on August 16, 2007, nor is there any reference to an acquisition or merger between the parties.

**The Instant Litigation**

TecServ initially filed suit against Stoneware in Utah state court.  After removal and other proceedings took place in Utah, TecServ's lawsuit was consolidated with the instant suit and the claims TecServ originally asserted in Utah state court became its counterclaims in the case at bar.  On September 17, 2007, Stoneware filed its Complaint in this Court, asserting that: (1) it is entitled to a declaratory judgment that TecServ has no right – ownership, contractual, or otherwise – to acquire any portion of the equity and/or stock of Stoneware; (2) TecServ owes Stoneware $151,644.54, plus pre-judgment interest, on past-due unpaid invoices; and (3) if Stoneware is the prevailing party, it is entitled to an award of its reasonable legal fees and costs, pursuant to the terms set forth in the Termination Agreement.  In its Answer, TecServ asserts various affirmative defenses and counterclaims, including breach of contract, breach of covenant of good faith and fair dealing, conversion, and unjust enrichment.

11

## Legal Analysis

**I.    Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  <u>See Shields Enter., Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  <u>See Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323.

## II.     Discussion

### A.     Does TecServ Have a Valid Claim to an Ownership Stake in Stoneware?

The parties dispute whether an oral contract was created on August 16, 2007, the terms of which included in part that TecServ would acquire ten percent of Stoneware stock in exchange for releasing five employees from their non-compete agreements so that Stoneware could hire them.[10]  Stoneware denies that an oral contract was ever

---

[10] TecServ originally alleged that the oral agreement included the right to acquire up to an additional 15% of Stoneware stock dependent upon TecServ's ability to raise investment funds.

(continued...)

reached between the parties, but contends that, in any event, the issue of whether that agreement was reached is irrelevant because the parties subsequently executed a Termination Agreement which released Stoneware from liability on any and all claims that could have stemmed from such an oral agreement, including TecServ's breach of contract counterclaim at issue here.  TecServ rejoins that the scope of the release contained in the Termination Agreement is limited to claims relating to the parties' Letter of Intent, not to claims relating to the alleged oral contract, and that the sole purpose of the Termination Agreement was to dissolve the Letter of Intent (which provided that Stoneware could not hire any of TecServ's employees) in order to allow TecServ to fulfill its responsibilities under the oral contract.

The parties agree that the Termination Agreement is governed by Indiana law.  See Termination Agreement ¶ 8 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana, without regard to such jurisdiction's conflict of laws principles.").  A release agreement, such as the Termination Agreement, "is a species of contract that surrenders a claimant's right to prosecute a cause of action." Morfin v. Estate of Martinez, 831 N.E.2d 791, 801 (Ind. Ct. App. 2005) (citations omitted).  Claims which fall outside the scope of a release should not be dismissed on summary judgment.  See Reuther v. Southern Cross Club, Inc., 785 F. Supp. 1339, 1343

---

[10](...continued)
However, in its responsive briefing on this motion, TecServ concedes that "the discussions regarding the acquisition of an additional 15% did not reach the level of a binding exchange of definite and enforceable promises."  Def.'s Resp. at 19.

(S.D. Ind. 1992) (Barker, J.).  However, summary judgment is properly granted on claims

that are encompassed within a release agreement, as long as that release was signed

knowingly and voluntarily.  Hampton v. Ford Motor Co., 561 F.3d 709, 714 (7th Cir.

2009).

     Under Indiana law, release agreements, such as the Termination Agreement, are

interpreted in the same manner as any other contract.  OEC-Diasonics, Inc. v. Major, 674

N.E.2d 1312, 1314 (Ind. 1996).  Thus, "[a]bsent an ambiguity, release provisions are

interpreted as a matter of law, and we look only to the instrument to ascertain the parties'

intent."  Morfin, 831 N.E.2d at 801.  However, when the contract language is ambiguous

and subject to more than one construction when "the intention of the parties is a question

of fact and resort to extrinsic evidence is proper."  Anderson v. Horizon Homes, Inc., 644

N.E.2d 1281, 1290 (Ind. Ct. App. 1995) (citing English Coal Co., Inc. v. Durcholz, 422

N.E.2d 302, 308-309 (Ind. App. 1981)).  Any ambiguities should be construed against the

drafter.  Steve Silveus Ins., Inc. v. Goshert, 873 N.E.2d 165, 175 (Ind. Ct. App. 2007)

(citations omitted).  Whether a contract is ambiguous is a question of law; a contract is

not ambiguous merely because the parties dispute its meaning.  Ecorp, Inc. v. Rooksby,

746 N.E.2d 128, 131 (Ind. Ct. App. 2001).

     The question before us is what the parties intended the scope of the release

contained in the Termination Agreement to be.  In order to make that determination, we

turn first to the contract language itself.  The disputed provision reads as follows:

     TecServ hereby irrevocably and unconditionally releases and forever

discharges Stoneware and its directors, shareholders, officers, representatives, employees, agents and assigns from any and all claims, debts, liabilities, demands, obligations, actions and causes of action (collectively, "*Claims*"), *relating to the* [Letter of Intent] *and with respect to all periods on or before the Effective Date* [August 27, 2007] *(whether or not such Claims are known or unknown, choate or inchoate).*

Termination Agreement ¶ 2 (emphasis added).  The parties dispute whether this language evidences an intent to limit the release only to claims that relate to the Letter of Intent, or whether the release covers claims relating to the Letter of Intent as well as any other claim arising on or before August 27, 2007, (the effective date of the Termination Agreement), regardless of the claim's relation (or lack thereof) to the Letter of Intent.

TecServ contends that the plain language of the Termination Agreement reveals that the parties intended the former interpretation, arguing that, had they intended the release to cover *any* claims with respect to the time period before August 27, 2007, they could have used a general release that did not include any limiting language such as the "relating to the Letter of Intent" phrase used in the Termination Agreement.  Stoneware rejoins that TecServ's interpretation ignores and renders meaningless the rest of the paragraph, which provides: "and with respect to all periods on or before the Effective Date (whether or not such claims are known or unknown, choate or inchoate)."  It contends that, had the parties intended the release to cover only those claims that related to the Letter of Intent, the inclusion of such language would have been unnecessary.

It is well-settled under Indiana law that "[c]onstruction of contract language that would render any words, phrases, or terms ineffective or meaningless should be avoided."

16

Ten Cate Enbi, Inc. v. Metz, 802 N.E.2d 977, 981 (Ind. Ct. App. 2004) (citing Indiana

Gaming Co., L.P. v. Blevins, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000)); see also

Gollberg v. Bramson Pub. Co., 685 F.2d 224, 229 (7th Cir. 1982) ("Every word in the

agreement must be taken to have been used for a purpose, and no word should be rejected

as mere surplusage if the court can discover any reasonable purpose thereof which can be

gathered from the whole instrument.") (quotation omitted).  As Stoneware asserts, the

remainder of the disputed paragraph would be unnecessary surplusage if the contract

language were construed in the manner championed by TecServ.  Thus, interpreting the

contract at bar in accordance with well-settled principles of contract interpretation, we

find that the plain language of the contract reveals that the parties intended for the release

to cover "any and all" claims related to the Letter of Intent *as well as* "any and all" claims

with respect to time periods on or before August 27, 2007, whether or not related to the

Letter of Intent.[11]

   For the foregoing reasons, we find that, even assuming an oral agreement between

the parties existed, any claim TecServ may have had against Stoneware relating to that

agreement was released on August 27, 2007, upon execution of the Termination

Agreement.[12]  In other words, by executing the Termination Agreement, TecServ waived

---

[11] Because we find the contract unambiguous, we need not resort to extrinsic evidence to construe its meaning.

[12] TecServ contends that, unless there was an oral contract between the parties at the time the release was signed whereby TecServ would receive 10% of Stoneware's stock, the Termination Agreement fails for lack of consideration because TecServ received nothing in

(continued...)

its right to assert the existence of a prior oral contract giving it the right to an ownership stake in Stoneware. Accordingly, we <u>GRANT</u> Stoneware's Motion for Summary Judgment on TecServ's counterclaim alleging breach of contract and hold that TecServ has no valid claim to an ownership stake in Stoneware.[13]

### B.      Defendant's Unjust Enrichment Counterclaim

Unjust enrichment is an equitable principle that imposes a quasi contract where there is no contract at all. The elements of unjust enrichment are the same under both Indiana and Utah law[14] and to recover under a theory of unjust enrichment a party must show that a measurable benefit has been conferred on a party under such circumstances that retention of the benefit without payment would be unjust. <u>Dominiack Mechanical, Inc. v. Dunbar</u>, 757 N.E.2d 186, 190 (Ind. Ct. App. 2001); <u>cf.</u> <u>Smith v. Grand Canyon</u>

---

[12](...continued)
return for releasing the five employees from their non-compete agreements. However, we need not address the merits of this argument because TecServ did not assert lack of consideration as an affirmative defense in its September 24, 2008 Answer. Under Federal Rule of Civil Procedure 8(c), "a party must affirmatively state any avoidance or affirmative defense." If a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived. <u>Castro v. Chi. Housing Authority</u>, 360 F.3d 721, 735 (7th Cir. 2004).

[13] Count II of TecServ's counterclaim asserts a claim against Stoneware for violation of the "covenant of good faith and fair dealing," pursuant to the common law of the State of Utah. Because that claim relates to the alleged oral contract of August 16, 2007, it is also a claim released by TecServ upon execution of the Termination Agreement. Accordingly, we <u>GRANT</u> Stoneware's Motion for Summary Judgment as to Count II of TecServ's counterclaim.

[14] The parties dispute whether Indiana or Utah law should be applied to this claim. However, because we find no relevant distinction between the laws regarding unjust enrichment in the two states, this dispute is irrelevant.

Expeditions Co., 84 P.3d 1154, 1162 (Utah 2003) ("A proper claim for unjust enrichment requires that the party show (1) a benefit conferred on one person by another, (2) an appreciation or knowledge by the conferee of the benefit, and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.") (citations omitted).

In Count VII of its counterclaim, TecServ alleges that Stoneware was unjustly enriched when it was permitted under the Termination Agreement to hire five of TecServ's then-employees.  TecServ asserts that, if it "had not released the employees from their covenants not to compete by signing the Termination Agreement, Stoneware's business would certainly have experienced disruptions and Stoneware would not have been able to maintain a seamless relationship with its most important customer."  Def.'s Resp. at 23-24.  However, regardless of the benefit that may have been conferred on Stoneware, TecServ may not recover under a theory of unjust enrichment because the Termination Agreement expressly provides that TecServ's employees are released from their non-compete agreements and may be hired by Stoneware.

Under both Indiana and Utah law, recovery under a theory of unjust enrichment is prohibited when an express contract explicitly addresses the issue, as is the case at bar. See Nickerson Co. v. Energy West Mining Co., ___ P.3d ___, 2009 WL 4681778, *1-2 (Utah App. Dec. 10, 2009) (holding that any claim for recovery based on a theory of unjust enrichment was barred because an express contract covered the subject matter of the litigation and unjust enrichment is "used only when no express contract is present")

19

(citations omitted); <u>Engelbrecht v. Property Developers, Inc.</u>, 296 N.E. 2d 798, 801 (Ind. App. Ct. 1973) ("An implied contract cannot exist where an express contract covers the identical subject.") (citations omitted); <u>see also</u> Dan B. Dobbs, <u>Law of Remedies</u> § 4.1(2) (1993) ("[O]ne who is enriched by what he is entitled to under a contract or otherwise is not unjustly enriched."). Accordingly, we <u>GRANT</u> Stoneware's Motion for Summary Judgment as to TecServ's counterclaim alleging unjust enrichment.

### C.   Open Invoices and Defendant's Conversion Counterclaim

Stoneware contends that it is owed by TecServ $151,644.54, plus the continually accruing interest on that sum,[15] for amounts due on various unpaid invoices originally issued during the spring and summer of 2007. According to Stoneware, on approximately twelve separate occasions, TecServ licensed software from Stoneware for resale to TecServ's retail customers, but never paid Stoneware for that software. In its response brief, TecServ admits that it has not made payments on any of the disputed invoices at issue in this litigation and concedes that the principal balance due on the open invoices equals $150,844.54.[16]

---

[15] Each of the invoices specifies that it is due within 30 days and that a 10% finance charge will be added to past due balances. Stoneware contends that, as of April 21, 2009, when it filed this summary judgment motion, the interest amounted to $24,140.55, plus $41.55 per day since that date.

[16] Stoneware alleges that the principal balance due is $151,644.54. However, the Court's calculation of the open invoices submitted as Plaintiff's Exhibit 3 aligns with TecServ's total of $150,844.54.

However, TecServ maintains that it is entitled to an offset of that amount because it is owed $163,181.20 by Stoneware for reimbursement of various training and traveling expenses as well as payment for software sales made by TecServ on Stoneware's behalf. TecServ asserts that, following the termination of the parties' Distribution Agreement, both parties continued to perform in accordance with its terms, under which TecServ received sixty percent of any sale that it made of Stoneware's software.  In support of that contention, TecServ points to a number of the invoices submitted by Stoneware dated after the Distribution Agreement was dissolved which show that TecServ was to receive sixty percent of those sales.  Docket No. 53-3.  Despite this alleged continuing arrangement, TecServ contends that, on August 31, 2007, following execution of the Termination Agreement, Stoneware sent an email to TecServ's existing customers providing the following:

> a.  Stoneware would like to inform you that Stoneware, Inc. has ceased its business relationship with [TecServ] which managed the partner channel for Stoneware, Inc.  Stoneware, Inc. hired some of the employees that you formerly worked with at [TecServ].  We welcome the [former TecServ employees] to the Stoneware, Inc. team.
>
> b.  If you were billed by [TecServ], please redirect all your payments to the following address: [Stoneware's address].

Docket No. 58-14.

TecServ maintains that, as a result of Stoneware's announcement and payment instructions, a number of customers who owed money to TecServ instead sent their payments directly to Stoneware.  Thus, TecServ asserts that it is entitled to its cut of the

sales it made for which it allegedly has not received payment.  Additionally, in Count V of its counterclaim, TecServ alleges that, by sending the August 31, 2007 email, Stoneware "exercised dominion and control over . . . Accounts Receivable[] and Services Income inconsistent with the rights of [TecServ]" and that, as a result of Stoneware's alleged conversion, TecServ was damaged.[17]  Ans. ¶¶ 73-74.

In its reply brief, Stoneware failed to dispute the amounts TecServ contends it is owed by Stoneware or otherwise address the issue of the open invoices or TecServ's counterclaim for conversion of accounts receivable.  Thus, because genuine issues of material fact remain regarding each party's obligations to the other and whether TecServ is entitled to offset the amounts it owes Stoneware with amounts it is allegedly owed, we are unable to reach a decision on this issue at the summary judgment stage.  Accordingly, we <u>DENY</u> Stoneware's Motion for Summary Judgment as to the open invoices and Count V of TecServ's counterclaim alleging conversion of accounts receivable.

## III.    Conclusion

For the foregoing reasons, we <u>GRANT IN PART</u> Stoneware's Motion for Summary Judgment as to Counts I, II, III, IV, VI, VII, and VIII of TecServ's

---

[17] In Count V of its counterclaim, TecServ also alleged conversion of the covenants not to compete as well as its sales channel and customer list.  These issues have been waived by TecServ in its responsive briefing.  However, in their briefing, the parties only minimally address TecServ's allegation of conversion of its accounts receivable.  Thus, this issue needs further development and, as such, summary judgment is not appropriate on the factual record before us.

counterclaim, and hereby declare that TecServ has no right to an ownership stake in Stoneware.  We <u>DENY IN PART</u> Stoneware's Motion for Summary Judgment as to the issue of the open invoices and Count V of TecServ's counterclaim alleging conversion of accounts receivable.

IT IS SO ORDERED.


Date: _____    12/21/2009

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Sam  Meziani
VANCOTT BAGLEY CORNWALL & MCCARTHY (SLC)
smeziani@vancott.com

Fred Anthony Paganelli
TAFT STETTINIUS & HOLLISTER LLP
paganelli@taftlaw.com

Brent D. Taylor
BAKER & DANIELS
bdtaylor@bakerd.com